Good morning. My name is Charles Clinton Hunter. I'm from the law firm of Reich & Binstock. We're in Houston, Texas. And I'm here today with my co-counsel from Tacoma, Mr. Stephen Hansen. We're here today to argue the case of Roger Deming. Will you be handling all of the argument? Yes, I will. Do you want to reserve any time for rebuttal? Yes, I will. I don't think my comments will take very long, and I would like to reserve the remainder. Go ahead. We represent Appellant Roger Deming, who in turn seeks to represent a class of thousands of customers of First Franklin Financial who paid multiple charges for a single service. They also paid multiple times for a compliance review service that was entirely voluntarily performed by an appellant, excuse me, by an employee. And they were charged multiple times against First Franklin's own compliance policies. With the Court's permission, I would like to address some inflammatory remarks made in the briefing of this case briefly. And second, I would like to address the merits of the case in the context of the accompanying decision that was recently provided us by First Franklin. First, this case is not and has never been an attempt to avoid liability on underlying loans. There is no request for an injunction against foreclosure. This case has nothing to do about the loans themselves. I think we understand that. The heart of your case is duplicative fees, isn't it? Yes, ma'am. All right. And duplicative fees for two matters, one for overhead charges or administrative fees or loan origination charges. My client paid three times for administrative services, but administrative services were only provided once. That is duplicative charges or direct explicit violation of First Franklin's own compliance policies. That's important, especially under the accompanying decision. Well, let me ask you this. I think this goes along with how you want to approach it, but in terms of my questions, can you explain how applying Washington State laws to the administrative fees and compliance review fees, can you explain how that does not obstruct a national bank's ability to exercise its federally authorized real estate lending powers as defined in Waters and Martinez? It might, but we don't have to go there. Well, it seems to me we do. Well, in the accompanying decision, and under American Airlines v. Wolin, the case is discussed there at page star 12, the U.S. Supreme Court said that where a company voluntarily agrees to abide by certain policies and conduct, that that, as opposed to a state-enforced system that the court is inquiring about, but where its own compliance guidelines say, we're going to do it this way, that becomes part of the contract, and that is not preempted by the NBA. But I guess then if you're saying, okay, so if it's part of the contract, but you still have to get past, I mean, do they obstruct a national bank's ability to exercise its federally authorized authority? We don't think that laws that, we're just asking the court to tell a bank not to lie to its customers and not to steal from them. Okay, I guess. I don't think that obstructs, I'm sorry. No, no, I interrupted you, so I should apologize to you. I don't think that obstructs their powers to make loans in the national interest. They just don't get to charge three times for something they do want, and they don't get to lie about the efficacy of their compliance review that they did voluntarily on their own, that didn't even detect violations of its own compliance policies, and that they charged twice for in violation of their own policies. Okay, so I understand that argument, but let me ask you this also. In Waters, it appears that the definition of a bank for purposes of the National Bank Act is a question of federal law. Do you argue that Federal Franklin was not a bank under federal law? And if so, can you explain that to me? No, the argument I've made is that it's not a bank under state law. It is considered a bank under federal law, as Waters says, that wholly owned subsidiaries are treated by the OCC based on their powers, not on their corporate charters. So if they have a wholly owned subsidiary that makes mortgage loans, the OCC treats them all as one entity. But my argument in the brief was that it's not a bank under the CLA because it's a finance company. It's not a bank. Okay, another thing that I want to understand about your argument, just because I like to understand what stays and what falls and what has to happen in order for you to prevail. The district court concluded that all of your client's claims were premised on a violation of the CLA or its regulations. Can you describe a common law claim by Mr. Deming that is not based on the CLA or its regulations? Yes, I'm so glad you asked. So I've started to say we're not talking about the loan agreements. We're talking about an implied and fact agreement for the provision of closing services. And that agreement was memorialized in a writing called a HUD-1 form final closing statement. So the charges were disclosed initially in an estimate, and then at the closing, final charges were presented in a writing. So there was a contract for the provision of services, for the provision of services by third parties, and for the provision of services by First Franklin. Written into that contract are First Franklin's compliance guidelines. They undertook to provide a certain level of service irrespective of the federal law and irrespective of the state law. They did it in order to try to comply with those laws and help their employees comply with the laws, but they said this is how we're going to do it. And they said actually charging three times for a service you render once is a violation of RESPA, so we're not going to do that. So when they did it anyway, and when the supervisors failed to enforce the compliance manuals of First Franklin, they acted negligently, and because the abuses were so rampant, Mr. Deming says they acted fraudulently. They must have known or should have known that their brokers were charging fees that were not allowed under their own compliance manual. What was the duty owed? We're talking about negligence. Well, they have a duty to supervise their employees, a duty not to steal, a duty to treat their customers honestly. And do you have a case that supports that? Well, there's negligence supervision cases, but I guess primarily the case relies on breach of contract. Our claim for negligence is that once they agreed to abide by a certain standard of conduct, they had a duty to enforce that standard of conduct, and that duty flowed to the customer. And when they failed to inspect the records or to care about what they found when they did inspect the records and failed to enforce their own compliance manuals, that they acted unreasonably and they caused harm to a person who was within that duty, within the. So it's basically a contract claim, not a negligence or a fraud claim. Well, I think it's all of those. They just have different colors. I still don't understand what the duty is. Well, the contract claim is that they didn't abide by their own compliance manual. The negligence claim is that they failed to supervise their employees and they failed to enforce their regulatory compliance manual, and that my client and the class that he wants to represent are people who are going to benefit from that duty. The fraud claim is that in those four years, between 2004 and 2008, thousands of violations of the compliance manual occurred. And they started with small amounts, like $250, and they went up to, in 2008, to $1,600 extra money, just slapped on for no service at all. Let me focus this question a little different way. This is a hypothetical. If you lose on the preemption issue, the complaint that you presently have filed, does that have any causes of action that would survive an adverse ruling on the preemption issue? Or would you have to amend your complaint? Does your present complaint allege these common law claims, or would you have to amend it? No, they are currently alleged. So there's nothing that you would add? You've alleged everything? Yes. The preemption claim, the district court said that our Consumer Protection Act claim was preempted because he could find no RESPA violation. But we beg to differ. Our case is entirely different from the Martinez case. We're not complaining about excessive markups or unreasonable charges. We're complaining about the type of conduct that RESPA directly regulates. It's charging for services not rendered. So our claim was dismissed. Well, duplicative charges and excessive markups are pretty similar. Well, I don't think so. I mean, is it a difference without a distinction or a distinction without a difference? I don't know how that saying goes, but it means are we splitting hairs there? No. No, these are very substantial hairs, and we're not splitting them. If you do a service one time, you charge for it one time, and you charge a million dollars for it one time, that's excessive. If you do a service one time and you charge for it three times, that's duplicative. And the origination fee, by definition, is supposed to cover all administrative services. So if you come along and just slap it up. So excessive is preempted, but duplicative is not? Under Martinez. All right. Do you want to save any time for rebuttal? Yes, ma'am. Thank you. Okay. Good morning, Your Honors. Good morning. Paul Fogel for Appalese. May it please the Court. I think I'll just get right into some of the questions that have been asked by the panel. Judge Callahan, your question or your comment about duplicative versus excessive is somewhat at the heart of this case. Under the two regulations at issue that would preempt the CPA and that we believe preempt the common law claims, it does not matter whether the charges are excessive, duplicative, not rendered for services, because of the language of 34.4A, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its federally authorized real estate lending powers and so forth. Specifically, a national bank may make real estate loans without regard to state law limitations concerning processing. That applies to the mortgage loan aspect of this. But then 7.4002 says the establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions made by each national bank. So it's a fact that Martine is involved in an overcharge, $800 for a charge that may be for something that should have been less. But it doesn't matter here for preemption purposes if First Franklin's administrative fees were duplicative, charged three times, which they weren't, and I can get into that in a minute. So for preemption purposes, under the two regulations that apply, and we've heard from opposing counsel that we have a national bank here, so we don't need to get into waters and operating subsidiaries and all that. It does not matter what, how these charges were bad. And I also put a footnote here. The appellants didn't raise safe and sound banking practices, the exception in OCC 7.4002, didn't raise it in the district court, didn't raise it in their opening brief. We said they didn't raise it in their opening brief. And they came back in their reply brief and said, oh, yes, we did. We moved to strike. But all that aside, Martinez completely disposes of safe and sound banking practices. Footnote 8 says that Martinez has urged reversal because Wells Fargo allegedly failed to pursue safe and sound banking principles. That is a matter for the OCC. It is not a matter for this court. Well, now, the district court, if, you know, this is, I was trying to explore this, and possibly you can give me your gloss on this, seem to, in finding preemption, seem to say that all the claims were premised on the CLA or its regulations. The appellant is now stating that they're common law claims there. And so I'm wondering in terms of, from your perspective, because the district court basically swept everything out on that. On CLA grounds. Yes. As the CLA being embedded in all of the common law claims. Right. But does that automatically get rid of all the common law claims or are there common law claims in the complaint or is there a common law claim that could be alleged? Okay. Let's start with the correctness of what the district court said. Look at ER 968 and 972. Those are two pages of the Second Amendment complaint, specifically paragraphs 4.8 and 8.2 of the Second Amendment complaint. And you will see references to the CLA right in the complaint. Now, this is a complaint that is only common law claims because by the time this was filed, the CPA claim was gone. There never was a standalone CLA claim. So this is only common law claims. And yet in those paragraphs, which are realleged and incorporated by reference and so forth,  the reason there's a negligence is for a violation of the CLA, specifically that regulation in effect in 2006 that applied only to junior liens. Okay. So that's number one. The district court was correct in stating that all of the common law claims have a CLA base. Second, even if the district court was wrong, if you look at And this is why we filed the 20HA letter in ACOPION. ACOPION stands for the proposition that a common law claim, their breach of contract, that seeks to, what's the language, impair, obstruct, condition the activities of a national bank cannot stand. The point of this is, and this was the subject of our motion to dismiss, 12b-6, that was granted in part, only in part. You remember that the part that we lost was the common law part. We knocked on the district court's door, 1292B. The district court said yes, you can go to the Ninth Circuit. We knocked on your door and you said no. But that claim was preserved. In other words, the claim that the common law claims are preempted by these OCC regulations because a common law breach of contract claim, as in the ACOPION case, that would obstruct, impair, condition a bank from engaging in mortgage practices, is barred if it's done by a national bank. If the charge is against a national bank, we have a concession that we're operating as a national bank. And if it would prohibit or disable a bank from, a national bank from conducting its affairs. And in the ACOPION case on pages 1 going over to 2 of my letter, the charge there would require the bank, Wells Fargo, to operate under diverse payment application schemes for loans and services in California and other states despite the uniform payment application terms of the mortgages and services. This is inconsistent with the purpose of the NBA to prevent the states from imposing diverse and duplicative limitations and restrictions on its powers, citing Waters. Let me just ask a question here. We are talking about duplicative fees. It may be the same as excessive. What is the remedy for appellants when they're charged duplicative fees? Well, Your Honor, this is, I mean, I don't want to say it's a problem, but our system of law, and he was relying on the Wolin case, which is an airline deregulation act. I mean, if I go, if my luggage is lost on an airplane, or if I, actually, I had a case about this. FedEx lost a huge piece of machinery that my client was shipping and wouldn't pay my insurance, my client's insurance. You know how sometimes you take out insurance, which I thought was outrageous. You know, I was saying, well, that can't be. The airline can't do that. Well, that claim was preempted by the airline deregulation act. And we have a system of law, which to some people may seem very unfair, that there may not be a remedy, or there may just be an administrative remedy. In this case, the footnote 8 in Martinez says that the remedy is with the OCC. If you have a complaint against a national bank for doing something that it shouldn't be doing under, well, let's say in this case, I believe your remedy is with the OCC. Now, that might not be very satisfactory, wasn't satisfactory to my client in the airline deregulation case. And many preempted claims leave you with the sense of being very unsatisfied. Well, and so, like on the limited luggage things, then you have to, if you fly, you know that, and you're not going to, everything you put on, you either stay in the limits, or if you could purchase something, some other sort of insurance, if there were some other umbrella insurance or something, then that's how you would have to do it. I mean, it's a fact of life in our, I'm sorry. Yeah. It's a fact of life in our national system. We have a national bank system to provide uniformity. Sometimes that's very unfair to a consumer. I'm not saying it's unfair here, and I would like to get to that, Judge Nelson. You're not admitting there were duplicate charges or excessive charges or anything like that. You're just saying this whole thing is preempted. Absolutely not, Judge Collins. I invite your attention to pages 363, 364, and 365 of the excerpts of record. Let's talk about the MAVENT fees. This is a $15 charge on each of the loans. MAVENT is a service that we paid to do compliance review on each loan. Now, what did they do for those $15? They looked and saw whether Mr. Jamming lived in a flood zone, whether he needed flood insurance. They would identify potential errors in the data collected. They would identify errors in the loan's annual percentage rate, the APR. We're talking about different loans here. So each loan has its own underwriting requirements. Each loan has its own documentation. Each loan has its own bucket of, you know, gigantic stack of documents. So if I understand you correctly, you're saying we did it right here, but even if we didn't, it's still preempted. Yes. And so don't get bogged down in the merits here because it's really about whether it's preempted or not. That is correct. And that preemption claim cuts through the entire case. You can decide this case on a single holding that says the CPA claim was preempted and the common law claims were preempted. But I would like to just get one little nudge in because I was talking about the Mavent charges. That's not the big deal in this case. That's $15. The big deal is the $795 on the senior loan and the $350 on the junior loan. Let me read to you with your indulgence what Julie Mary Chandler, former Director of Regulatory Risk and Chief Compliance Officer for First Franklin, without dispute what First Franklin folks had to do for that $350. But they aren't disputing that. They're disputing that they pay it once, but they don't want to pay it two and three times for the very same services or for no services at all when they were paying for the compliance search, but it excluded Washington compliance regulations. I don't see them as complaining about one administrative fee. They were complaining about two or three or four. Well, Judge Elson, I do see them complaining about two administrative fees. The RESPA claim, 8B claim, because of the Martinez case, they have to prove that there's a tribal issue of fact that we did nothing whatsoever, no services whatsoever, a phrase from Martinez. Martinez construed RESPA, said we don't need to get to this HUD regulation that they rely on under Chevron deference because the statute is unambiguous in order to make out a RESPA claim, which by the way was not in their complaint, but they have embedded it into the common law claims. They have to prove that we performed no services whatsoever, not that if we just overcharged them, it's not a violation of RESPA. This is not a preemption issue. This is a did we violate RESPA because RESPA is not a preemption. RESPA is a federal law that provides a federal remedy. It's not a preemption issue. But if you look at pages 364 and 365, you will see a list of things that First Franklin did. We go through an extensive process to review the documentation, perform an underwrite, review the appraisal, all the way to docking and funding the loan. We build a file. We cause early disclosures to be generated. We make sure we have a complete file. Then we pass it on to the underwriter. Underwriter reviews the loan, looks at the guidelines, identifies additional information needed. We put together conditional approval or a possible decline. Then the loan account manager works with the broker to get additional information. We read this in the briefs, that they did perform services. I don't think that's the question. But if they performed, we have two buckets here, two loans at Mr. Deming's request, probably so he could avoid PMI, paying mortgage insurance. One bucket is for the 250 loan. The other is for the 50 loan. The 50 is a junior lien. It has more stringent underwriting requirements. It's not the same, so it's not duplicative because if we have to look at underwriting on the junior, when you take out a junior loan, because it's junior, it's second in the queue, it's more stringent and you have to look at whether the borrower has sufficient credit to make that a decent loan. You all forget, and forget that. Let's just say you still have to prepare a file. You have to make sure the signatures are there. You have to make sure the file's in order. You have to make sure who's getting paid, money's going, you know. What I'm saying is it's not a duplicative fee. One fee is for the senior, another fee for the junior. It's not the same services. It's not doing the same thing because I, if I'm the manager, account manager, I have to look. Are there all the signatures for that junior loan? Did Mr. Deming sign all of those over here? And did he sign all of those over here? Did the underwriter do a correct job over here? Did the underwriter do a correct job over there? I think we understand your point on that. I mean, my point is that the RESPA claim falls because of undisputed facts. It doesn't fall because of preemption. It has nothing to do with the CLA or the CPA. So the point is it fails of its own weight because there's no contradictory evidence. And if you look at Martinez and follow Martinez, which Judge Callahan, of course, was on, the question is did we perform no services whatsoever? The answer is no. There's no contrary evidence in the record. So the RESPA part of this case, which, again, is not a cause of action alleged in the complaint. It's only embedded in the common law claims. He can't, Mr. Deming cannot maintain a common law claim based on a RESPA argument because the factual foundation of the RESPA argument fails. All right. You start. You're actually in overtime. But if any of my panel members have additional questions, there do not appear to be additional questions. Thank you. Thank you. Well, counsel has testified about facts that aren't in the record. All that the deposition testimony that he quoted established what types of services are performed by First Franklin. It doesn't say we do these things for the resignation fee. We do these things for our $795 fee. We do these other things for our $295 fee. None of that has been established. Actually, there is a tribal issue of fact about what those fees were charged for, if anything. And it does matter whether they're charged all at one time or three or four or five or six times, however many times they want to charge them. Because when you get your estimate on your HUD-1 estimate, there's an origination fee. And you use that to compare to the origination fee that other people are going to charge. And that's called an origination fee. And the borrower just looks at origination fee. Now, they sneak in some additional fees under the guise of administration fee. Who knows what that is? And it makes it impossible for the consumer to compare apples and apples. That's why it matters. But it matters because First Franklin said we're not going to do this. If we have a senior loan and we charge a fee on a senior loan, we are not going to charge the same fee on the junior loan because it covers the whole package. And as a matter of fact, if you look at the HUD-1 on this loan, the origination fee was only charged on the senior loan. There is no origination fee charged on the junior loan. The amount of the origination fee, if you do the math, covers both loans. So the idea that there's two separate buckets is just made from whole cloth. That is the creation of counsel. That's not the way First Franklin operates. That's not what it tells its managers to do. That's not what it tells its brokers to do. It says do not charge twice. Charge once, charge the right fee, do not charge twice. This is how we do business. This is how we have to do business. But it didn't do business that way. And that's why we're here complaining. The preemption argument is if you read a copy, and I'm sure you have, the American Airlines versus Wallen case is right on point. It says when a company assumes voluntarily a code of conduct that is not state imposed, not federally imposed, that's at page 12 at the very end of star 12, when it assumes a set of guidelines, it's bound by them, and that's just a common law claim, and preemption has nothing to do with it. And that's what our common law claims are. And the OCC regulations are explicit. They don't intend to preempt common law claims. In the Akopian case, that ruling was based on a state regulation that was imposing state terms into a contract. At least that's what one of the parties wanted to do, wanted to read that law into the contract and change the late fee approach to be based on the state imposed standard rather than a standard agreed on by the parties. But that California Court of Appeals said if this had been voluntary standards, not state imposed, not federal imposed, preemption has no place. And that's why preemption has no place in this case, at least in regard to our common law claims. All right. That's all I have. All right. Thank you both for your argument. This matter will stand submitted.
judges: Collins, Nelson, Callahan